## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Cr. No. 16-10233-RGS |
| DONNA M. ACKERLY, et al., | |
| Defendants | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR SEVERANCE OF COUNTS

The government respectfully submits this response in opposition to the defendants' motions to dismiss and for severance of counts. Relying on misstatements of fact and mischaracterizations of the indictment, the defendants seek to dissect the government's case into bite-size pieces, and thereby to keep the jury from understanding the full scope of their criminal agreement. That is not permitted. For that reason, and the reasons set forth below, the defendants' motions should be denied.

## BACKGROUND

The indictment alleges a straightforward scheme by the defendants to bribe an employee of Institutional Shareholder Services ("ISS"), a proxy advisory firm, to provide them with confidential information about how ISS's clients had voted in certain shareholder contests, and to defray the cost of those bribes by charging some of them to clients of the defendants' own employer, Georgeson, LLC ("Georgeson"), disguised as legitimate expenses. Count One of the indictment charges a single conspiracy with two objects: *first*, to commit wire fraud and honest services wire fraud by defrauding ISS of the honest services of its employee, Brian Bennett, and of the confidential voting information of its clients—that is, whether and how they voted on specific shareholder proposals; and *second*, to commit wire fraud by falsely invoicing clients of

1

Georgeson for part of the cost of the bribes paid to Bennett.  Counts Two through Four charge substantive counts of wire fraud related to specific fraudulent invoices to Georgeson clients, while Counts Five through Seven charge substantive counts of wire fraud and honest services wire fraud related to specific bribes paid to Bennett or directives to obtain confidential ISS information from him.

The twin frauds that are the objects of the conspiracy are inextricably intertwined:  the first, to bribe Bennett to obtain confidential information from ISS; the second, to pass part of the cost of *those same bribes* to the defendants' own clients using falsified invoices.  And the indictment alleges that all the defendants actually engaged in both of those frauds.

Thus, the indictment alleges, among other things, that: 1) defendants Donna Ackerly, Charles Garske and Richard Gottcent directed defendant Michael Sedlak to obtain information about how institutions voted, including by *specifically* directing him to obtain that information from ISS; 2) Sedlak obtained the information from Bennett—who provided it in violation of his duties to ISS and its clients—and gave Bennett tickets to concerts and sporting events in exchange; 3) Sedlak forwarded the confidential information he received from Bennett to Ackerly, Garske and Gottcent and advised them that it came from his "guy" at ISS; 4) Sedlak accounted for the bribes on expense reports submitted to Gottcent; and 5) Ackerly, Garske and Gottcent approved billing part of the cost of the bribes to Georgeson's clients, and Ackerly and Garske provided Sedlak with names of clients to bill and instructed Georgeson's billing department to falsely describe the charges in invoices.  Dkt. 34, ¶¶ 17, 24, 60.

For example, the indictment alleges that in February 2008, Sedlak emailed Bennett seeking information about how a number of institutional investors had voted on a proposed performance incentive plan for a California-based semiconductor company.  *Id*. ¶ 19.  Bennett

provided this information to Sedlak, who then forwarded it to Gottcent, indicating in the subject line of the email that it came from ISS. *Id*. ¶¶ 20-21.  One week later, Sedlak offered Bennett two tickets to an Opening Day baseball game, and Bennett accepted. *Id*. ¶¶ 22-23.  Sedlak and Gottcent then discussed, in a single e-mail, *both* the bribe to Bennett *and* billing the cost of that bribe to clients of Ackerly and Garske. *Id*. ¶ 24.  Sedlak wrote:

> Mentioned that he [Bennett] wants 2 tickets for opening day of the Nationals game which he gets every year.  Looked at on-line ticket brokers and the cheapest that I came across through ticket liquidators is approx. $400-450 a ticket.  I told him that the request is substantiated because of the large volume of requests that he does respond to.  Told [Georgeson's Chief Operating Officer] that I will order them today.  [I] also told [the Chief Operating Officer] that I spoke to Donna [Ackerly] & Chuck [Garske] and they are able to bill $500 each for clients.  Donna said I can bill $500 to [a Florida-based home builder] when I get my statement.  Are you fine with me putting it on my card?

*Id*.  Gottcent approved Sedlak's plan. *Id*. ¶ 25.  Sedlak then submitted an expense report listing the expense as "tickets for Brian Zentmyer" (as Bennett was then known), and indicating that the cost was to be split between two Georgeson clients. *Id*. ¶ 28.  The indictment alleges that Ackerly approved invoicing the Florida-based builder for a portion of the cost of the "tickets for Brian," with the invoice falsely describing the charge as "travel expenses." *Id*. ¶¶ 29-31.  And it alleges that Garske authorized invoicing a Connecticut-based technology company for a portion of the cost, with the invoice falsely describing the expense as "general trucking" and "Federal Express" charges. *Id*. ¶ 32.

The indictment similarly alleges that in early 2010, Sedlak requested confidential voting information from Bennett about a pending shareholder proposal for a large, Wisconsin-based industrial conglomerate. *Id.* ¶ 41.  Bennett provided the information, and some time thereafter Sedlak provided Bennett with two tickets to an Opening Day Yankees-Red Sox game, at a cost

of more than $800.  *Id*. ¶¶ 43-44.  Sedlak recorded the charge on his expense report as a gift for Bennett, and Ackerly authorized billing one of her clients for part of the cost, falsely described as "travel expenses," while Garske authorized billing part of the cost to one of his clients, falsely described as "market intelligence."  *Id*. ¶¶ 45-47.

As yet a third example, the indictment alleges that in or about October 2011, Sedlak complained to Gottcent about the cost of the bribes and the difficulty of finding account executives—like Ackerly and Garske—willing to pass that cost on to their clients.  He wrote:

> [I]nfo does not come cheap. . . . for each request, people want tickets, dinner or whatever and that is not always easy to find someone to bill and most [account executives] are not forthcoming with providing a client name. . . I understand we are public but when it comes down to prime time—all people care about is getting the info and nothing else matters. . . ."

*Id*. ¶ 60.  The indictment also alleges multiple other instances in which Ackerly, Garske and Gottcent sought and received confidential information from Bennett, and participated in the fraudulent billing of bribes.  *See, e.g.*, ¶¶ 35, 50, 49-52, 56-59, 64, 66, 68, 70, 72, 74.

## ARGUMENT

The defendants seek the dismissal of Count One as duplicitous because they contend it charges two conspiracies, not one.  Similarly, they seek the severance of counts Counts Two through Four, related to the bribery of Bennett, from Counts Five through Seven, related to the fraudulent billing of their clients for those bribes, based on their contention that the two frauds are not linked.  Finally, they move to dismiss Count Five on the basis that it purportedly fails to allege Garske's knowing and intentional involvement in the fraud.

The defendants' arguments run counter to black-letter law and the facts as pled, and should be rejected.  The indictment properly charges a single agreement to commit two crimes— which are themselves intertwined as part of a "common scheme or plan"—and *all* of the

4

substantive counts are also acts in the furtherance of the charged conspiracy.  Likewise, the defendants' effort to dismiss Count Five relies on a tortured misreading of the indictment that ignores its allegations regarding Garske's knowledge, intent and participation in the scheme.

I.      Count One Is Not Duplicitous.

The defendants' duplicity argument fails as a matter of law because Count One properly charges a single conspiracy to engage in two interrelated frauds.

A.      Applicable Law

An indictment is duplicitous "if it joins, in a single count, two or more distinct offenses." *United States v. Prieto*, 812 F.3d 6, 11 (1st Cir. 2016).  Duplicitous indictments present two primary concerns: first, "that a criminal facing such an indictment might not know which charge to prepare to defend against," and second, that a "jury could find a defendant guilty without actually reaching unanimity." *Id*.

It is well-settled, however, that "the allegation in a single count of a conspiracy to commit several crimes is *not* duplicitous, for '[t]he conspiracy is the crime and that is one, however, diverse its objects.'" *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980) (quoting *Braverman v. United States*, 317 U.S. 49, 54 (1942)) (emphasis added); *accord United States v. Dunbar*, 367 F. Supp. 2d 59, 61 (D. Mass. 2005).  This makes sense, because a conspiracy is little more than an agreement among co-conspirators, and a "single agreement may encompass multiple illegal objects." *Murray*, 618 F.2d at 896.  Moreover, even if a single conspiracy "could have been charged as two separate crimes," that is "irrelevant" to a court's determination as to whether or not a particular count is duplicitous. *Dunbar*, 367 F. Supp. 2d at 61 (quoting *United States v. Valerio*, 48 F.3d 58, 63 (1st Cir. 1995)).

In the context of a pre-trial motion to dismiss, a duplicity challenge to a conspiracy charge "turns on whether the Indictment properly alleges that all of the conspirators joined in a common agreement to achieve the conspiracy's unlawful objectives," *United States v. Acevedo Vila*, 588 F. Supp. 2d 194, 201 (D.P.R. 2008), or whether, instead, the indictment alleges multiple, distinct conspiracies.  In making such an assessment, the "allegations of an indictment are presumed to be true," and a court may not "inquire into what the evidence at trial is expected to prove."  *Dunbar*, 367 F. Supp. 2d at 60.  Courts in this Circuit thus routinely decline to dismiss conspiracy counts based on pre-trial claims of duplicity.  *See, e.g., id.*; *Acevedo Vila*, 588 F. Supp. 2d at 200-02.   That is because "[w]hether evidence shows one or many conspiracies is a question of fact for the jury."  *United States v. Niemi*, 579 F.3d 123, 127 (1st Cir. 2009); *see also, e.g.*, *United States v. LiCausi*, 167 F.3d 36, 45 (1st Cir. 1999) (same); *United States v. Wihbey*, 75 F.3d 761, 774 (1st Cir. 1996) (same).

B.     Count One Properly Charges a Single Conspiracy with Two Objects

Count One properly charges a single conspiracy to bribe Bennett to obtain confidential voting information from ISS, and to minimize the cost of those bribes by passing off part of their cost to unsuspecting clients of Georgeson.  While the defendants contend that the count is duplicitous because the charged conspiracy is, in reality, two separate conspiracies, that is a question of fact for the jury, *after* the government has presented its evidence.  At this stage of the proceedings, the Court must presume the allegations of the indictment to be true, and may not "inquire into what the evidence at trial is expected to prove."  *Dunbar*, 367 F. Supp. 2d at 60.[1]

---

[1] If the evidence at trial warrants, the Court can instruct the jury on how to distinguish a single conspiracy from multiple conspiracies.  *See, e.g., United States v. Soto-Beniquez*, 356 F.3d 1, 22 (1st Cir. 2003) (court properly instructed jury that it must "acquit 'even if the evidence in the case shows that defendants were a member of some conspiracy, and not the single conspiracy

For that reason alone, the defendants' request for the Court to dispose of the conspiracy count now, based on their self-serving assessment of what the evidence will show at trial, must be rejected.

Even if the Court were to inquire further, however—which it should *not*—the defendants' motion should be denied because the indictment alleges that the defendants shared a common conspiratorial goal, that the twin frauds that were the objects of the conspiracy were interrelated, and that *all* of the defendants not only agreed to commit both crimes, but did in fact do so.  More is not required even after trial.  *See United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) ("To determine if the evidence supports finding a single conspiracy . . . courts have looked for (1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants.").

> 1.    The Defendants Shared a Common Goal

First, the indictment alleges that the defendants shared a common goal.  It notes that the "primary purpose" of their conspiracy was to "make money and gain an illicit business advantage by corruptly obtaining nonpublic information about the voting practices of [ISS's] clients, which information the defendants used to advise their clients on matters requiring shareholder approval."  Dkt. 34, ¶ 15.  *See United States v. Ortiz-Islas*, 829 F.3d 19, 25 (1st Cir. 2016) (existence of a common goal "is broadly drawn" and is satisfied by a "shared interest" in a given result).  It also alleges that the defendants sought to "limit the costs" of those bribes to their own employer by misleading Georgeson's clients into paying part of their cost.  Dkt. 34, ¶ 16.

---

charged in the indictment'").   At this stage, however, it is premature to consider whether such an instruction is warranted.

The defendants' contention that the conspiracy encompasses two schemes with different goals—"the first to obtain information improperly from one company . . . and the second to hide entertainment costs on bills to the Firm's clients," Dkt. 196 ("Def. Br.") at 10—is mistaken. While the defendants cleverly seek to minimize the connection by referring to the fraudulently billed items generically as "entertainment costs," that is *not* what the government has alleged. Rather, the government has alleged that the defendants agreed to bribe Bennett with tickets to concerts and sporting events, *and* to pass off part of the cost of *those same tickets* to their clients via falsified bills that described them as something else.[2]

The fact that the defendants accomplished their common goal by paying bribes *and* by attempting to pass on the cost of those same bribes does not turn one conspiracy into two separate endeavors. The First Circuit's decision in *Prieto* is instructive. In that case—which involved a charge of mail fraud, rather than of conspiracy—the court *rejected* the defendant's claim of duplicity where the government had alleged, as part of a single count, that the defendant ran a multi-faceted scheme that defrauded some 30 mortgage lenders and involved "deceit of homeowners, straws, and lenders" alike. *Prieto*, 812 F.3d at 10. Noting that the indictment "packaged all averments under a single mail fraud count," the court concluded that the indictment properly "made clear that the government undertook the burden of proving a single, overarching scheme." *Id.* at 10-11. It reasoned:

> Schemes to defraud are often, by their nature, complex. The accomplishment of a scheme's fraudulent goal and the simultaneous evasion of detection by its victims of the authorities

---

[2] Similarly, the defendants' contention that "40% of the ten fraudulent invoices attributed by the government" to Garske have no connection to Bennett or ISS is unfounded. Def. Br. at 10. The indictment alleges a scheme to bribe Bennett, and to pass on the cost *of Bennett's bribes* through fraudulent invoices. It contains not a single allegation concerning bribes passed to anyone else, or invoices that are fraudulent in some other respect. The defendants' conclusory assertion to the contrary, for which they provide no citation, is simply untrue.

> often necessitate multi-faceted patterns of criminal activity that
> may harm different groups of victims at different times. . . . .
> Having put together such a multi-faceted scheme, [the defendant]
> can hardly protest that the government was willing to charge and
> bear the burden of proving such a scheme.

*Id.* at 12.  Likewise here, the primary goal of the defendants' conspiracy was to gain an illicit business advantage by obtaining confidential information from ISS and using that information to advise their own clients.  The defendants chose to accomplish that goal in a multi-faceted way—by paying bribes that harmed ISS and its clients and by attempting to recoup the cost of those bribes via falsified bills that harmed Georgeson's clients.  Their chosen approach does not morph a single agreement into multiple conspiracies.  *Cf., e.g., United States v. Holt*, 777 F.3d 1234, 1263 (11th Cir. 2015) ("[I]t is often possible . . . to divide a single [ ] conspiracy into sub-agreements," but "this does not necessarily mean that more than one conspiracy exists."  The "key is to determine whether the different sub-groups are acting in furtherance of one overarching plan."); *United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The fact that a conspiracy can be divided into distinctive sub-groups does not mean that there is more than one conspiracy.  As long as the  different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy."); *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986) ("a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies").

Similarly, the defendants' attempt to segregate themselves into two bands of conspirators—some of whom focused on fraudulent billing, and others of whom focused on bribery—mischaracterizes the government's allegations, and renders their reliance on *United States v. Munoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997), misplaced.  In that case, while the government charged two distinct frauds as part of a single bank fraud conspiracy—apparently

because both frauds involved a single victim and two bank officers participated in both schemes—the frauds, and the other participants in the two schemes, were in all other respects unrelated.  *Id*.  In determining that the charge was duplicitous, the district court in Puerto Rico noted that the "description of the overt acts is neatly divided between two distinct sets of co-conspirators."  *Id*. at 71.  The defendants here attempt to shoehorn the instant facts into an analogous posture, claiming that the "overt acts" that concern the "fraudulent billing practices" relate only to defendants Garske and Ackerly.  Def. Br. at 10.  But that is untrue, as the indictment itself makes plain, and as the evidence at trial will show.

> 2.   All Four Defendants Participated in Both Aspects of the Conspiracy

Second, and relatedly, the indictment alleges that *all four* defendants agreed *both* to bribe Bennett to obtain confidential information *and* to minimize the cost of those bribes to Georgeson by fraudulently billing their own clients.  Accordingly, while the next factor in determining whether a single conspiracy existed—overlap among the participants—may be satisfied "by the pervasive involvement of a *single* core conspirator," *Portela*, 167 F.3d at 695, and while Sedlak, who served as the bridge between Georgeson and ISS, may be described in that way, the indictment alleges that all of the defendants participated in every aspect of the conspiracy.

Indeed, as noted, the indictment alleges not only that Ackerly, Garske and Gottcent *directed* Sedlak to obtain information about how institutions voted—including on occasion by *specifically* directing him to obtain that information from ISS—but also that Sedlak kept his co-conspirators apprised that the information *in fact* came from his "guy" at ISS.  Dkt. 34, ¶ 17.  And it alleges that Sedlak received approval from Ackerly, Garske and Gottcent to bill part of the cost of the bribes to Georgeson's clients, and that Ackerly and Garske instructed Georgeson's billing department to falsely describe the charges in invoices.  *Id*.

The defendants' contrary suggestion—that any overlap among the defendants was coincidental insofar as "they worked together," Def. Br. at 11—must be rejected because the indictment alleges otherwise, and because that factual question is properly reserved for the jury at trial.  Moreover, even assuming, *arguendo*, that Ackerly and Garske were more involved in the fraudulent billing portion of the conspiracy and that Gottcent and Sedlak were more involved in the bribery portion, that is of little moment.  Even if "every defendant did not participate in every transaction necessary to fulfill the aim of their agreement [that] does not transform a continuing plan into multiple conspiracies."  *United States v. Drougas,* 748 F.2d 8, 17 (1st Cir. 1984); *see also United States v. Berroa*, 85 F.3d 131, 154 (1st Cir. 2017) (each defendant need not know "all of the details of the conspiracy or participate in every act in furtherance of the conspiracy"); *Salinas v. United States*, 522 U.S. 52, 64 (1997) (conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense).

### 3.    The Two Frauds Were Interdependent

Third, the indictment alleges that the two components of the conspiracy were interdependent, insofar as without the bribery, there would have been no need for the fraudulent billing, and the fraudulent billing, in turn, was advantageous to the continued success of the bribery.  *See Ortiz-Islas*, 829 F.3d at 26 (noting that interdependence "exists where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme"); *Portela*, 167 F.3d at 695 (same).

Once again, paragraph 24—describing Sedlak's email to Gottcent—is instructive, alleging that even before purchasing tickets with which to bribe Bennett, Sedlak enlisted Ackerly, Garske and Gottcent to make sure that the cost of the bribe could be passed on to Georgeson's clients.   The indictment also describes another email to Gottcent in which Sedlak

noted that "info does not come cheap. . . . for each request, people want tickets, dinner or whatever and that is not always easy to find someone to bill and most [account executives] are not forthcoming with providing a client name." Dkt. 34, ¶ 60.  Even without more, these emails make clear that the effort to defraud Georgeson's clients of part of the cost of the bribes was advantageous to the bribery itself (and that, without the bribery, the false billing would have been unnecessary).[3]

II.     The Billing Counts Should Not Be Severed from the Bribery Counts

Relying on the same mischaracterizations of the charges, the defendants seek severance of the billing counts from the bribery counts, contending that the counts are not properly joined under Federal Rule of Criminal Procedure 8(a), and that even if joinder is proper, the counts should be severed under Rule 14 to avoid prejudicing the defendants.  The defendants' arguments should be rejected.

A.     The Counts Are Properly Joined Pursuant to Rule 8(a).

Joinder of counts is permissible if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  The First Circuit construes this rule "generously in favor of joinder." *United States v. Boulanger*, 444 F.3d 76, 87 (1st Cir. 2006).  In making this assessment, courts have historically considered "whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the

---

[3] The defendants' argument that the frauds were not "interdependent" because only a "portion" of the bribes, as opposed to the entirety of the bribes, was falsely billed to clients, merits little discussion.  Def. Br. at 10.  The fact that the defendants did not bilk their clients more than they did has no bearing on the question whether the two frauds were "interdependent."  And the defendants' unsupported assertion that "not all of the allegedly fraudulent bills actually included tickets given to Mr. Zentmyer," is, as noted above, simply untrue.

time frame in which the charged conduct occurred." *Id.* (citation and internal quotation marks omitted). "'Similar'" does not mean 'identical,'" however, and similarity is assessed by how "the government saw its case at the time of indictment." *Boulanger*, 444 F.3d at 87; *United States v. Melendez*, 301 F.3d 27, 35 (1st Cir. 2002) (same).

Here, as noted, Count One of the indictment charges a conspiracy with two objects: (1) to commit wire fraud and honest services wire fraud by defrauding ISS of the honest services of Bennett, and of the confidential voting information of its clients; and (2) to commit wire fraud by falsely invoicing Georgeson's clients for part of the cost of those bribes. Counts Two through Four charge substantive counts of wire fraud related to specific invoices to Georgeson clients approved in March, June and October of 2011, while Counts Five through Seven charge substantive counts of wire fraud and honest services wire fraud related to specific bribes to Bennett or directives to obtain confidential information from him in March, June, and August of 2011.

Where, as here, all the substantive counts are simply acts in furtherance of the conspiracy count, joinder is proper on that basis alone. *See, e.g., United States v. Natanel*, 938 F.2d 302, 307 (1st Cir. 1991) ("it is settled that a conspiracy count can forge the needed linkage" to justify joinder); *United State v. Kinsella,* 530 F.Supp.2d 356, 359 (D. Maine 2008) (the "First Circuit 'has repeatedly held that a conspiracy count can be a sufficient connecting link between . . . multiple offenses that tips the balance in favor joinder'"); *see also United States v. Baltas*, 236 F.3d 27, 33 (1st Cir. 2001) (joinder of counts proper where substantive counts were overt acts of the RICO conspiracy); *United States v. Boylan*, 898 F.2d 230, 245 (1st Cir. 1990) (joinder is proper where a single RICO count embraces "all of the acts and transactions upon which the other . . . counts [are] based"). This should end the analysis.

Moreover, for all the reasons set forth above, the defendants' wishful contention that the billing and bribery counts are neither "based on the same act or transaction, nor part of a common scheme or plan," Def. Br. 13, is simply untrue.  The emails and other allegations referenced above demonstrate that joinder is appropriate because the alleged scheme to obtain confidential information through bribery was part and parcel of the alleged scheme to defraud clients of the cost of the bribes.  And, as noted, the fraudulent billing would not have occurred *but for* the payment of the bribes.  *See United States v. George*, No. 03-10091-PBS, 2004 WL 746282 (D. Mass. Apr. 6, 2004) (joinder is proper when "one illegal activity provides the impetus for the other illegal activity"); *see also United States v. Yefsky*, 994 F.2d 885, 896 (1st Cir. 1993) (tax fraud counts were properly joined with mail fraud counts "because some of the unreported income was the fruit of the mail fraud scheme").  Finally, both sets of substantive counts involve the wire fraud statute, and the time frame for the counts is a single seven-month period in 2011 (within the larger four-and-a-half year span of the conspiracy).

B.     Defendants Have Not Shown Any Undue Prejudice that Justifies Severance

The defendants' alternative argument—that the billing and bribery counts should be severed because trying them together would be prejudicial—is equally frivolous.  Rule 14(a) provides that the Court *may* order separate trials of counts where joinder "appears to prejudice a defendant or the government."  To overcome the presumption of joinder, however, a defendant seeking severance must make a "strong showing of evident prejudice."  *United States v. Richardson*, 515 F.3d 74, 81 (1st Cir. 2008) ("Some prejudice results in almost every trial in which the court tries more than one offense together.  Garden variety prejudice, however, will not, in and of itself, warrant severance."); *see also United States v. Hart,* No. 09-10005-PBS, 2010 WL 583653 (D. Mass. Feb. 11, 2010) ("defendant must demonstrate prejudice so pervasive

that it would be likely to effect a miscarriage of justice") (citation and internal quotation marks omitted).  Severance is inappropriate where "evidence as to each group of offenses would" be admissible "in a trial of the other."  *United States v. Fenton*, 367 F.3d 14, 22 (1st Cir. 2004).

The defendants cannot meet this heavy burden.  Evidence of either the bribery or the fraudulent billing would be admissible in a trial of the other because, as noted, the charged conspiracy incorporates *both* frauds, and the substantive counts are simply acts in furtherance of that conspiracy.  Accordingly, should the Court conclude that the conspiracy count is not duplicitous, the defendants' severance motion will be moot because the evidence of both schemes will be admissible to prove the conspiracy.  *See Fenton*, 367 F.3d at 22 (denying severance where all the counts "were charged as overt acts in furtherance of the conspiracy described in the indictment").

Moreover, even were the Court to determine that the conspiracy count is duplicitous, evidence of both frauds would *still* be admissible, regardless of severance, because the bribery and false billing are intertwined and inseparable and *both* concern the payment of bribes to Bennett.[4]  Evidence of the bribes paid to Bennett would be admissible at a trial of the billing fraud *both* to show that the invoices were false *and* to prove the defendants' motive and intent to falsify them.  Evidence of the false billing would be admissible at a trial of the bribery *both* to

---

[4] The intertwined nature of the frauds makes *United States v. Silvia*, 14-CR-10082-GAO, 2016 WL 234801 (D. Mass. Jan. 20, 2016), inapt here.  In that case, the district court determined that two fraud schemes—one involving the sale of stock to several victims between 2009 and 2011, the other involving a real estate loan by a single, unrelated victim in 2013—were "largely, if not entirely distinct in the nature of the transactions, the alleged misrepresentations, and the participants." *Id*. at *3.  Likewise, the defendants' conclusory assertion that the government seeks to introduce evidence of their twin frauds as propensity evidence is untrue.  Def. Br. at 15.  Rather, the government contends that the defendants conspired to bribe Bennett, and to minimize the cost of those bribes so as to ensure their continued ability to pay them, and thereby committed three crimes—conspiracy, wire fraud, and honest services wire fraud—all at once.

prove the defendants' knowledge of and participation in the bribery, *and* their consciousness of guilt.  *See* Fed. R. Evid. 404(b) (evidence of other crimes or acts is admissible to prove "plan," "intent," "motive," or "knowledge"); *see also United States v. Sebbagala*, 256 F.3d 59, 68 (1st Cir. 2001) ("Evidence of uncharged fraud activity that is substantially similar to the activity underlying a charged fraud scheme often is admitted to show knowledge or intent to defraud with respect to the charged fraud scheme."); *United States v. Appolon*, 715 F.3d 362, 373 (1st Cir. 2013) (evidence of related uncharged fraud is admissible to show the defendant's "intent to engage in the conspiracy, to demonstrate his knowledge of the conspiracy's mechanics, and to eradicate any doubt that his participation was somehow unintentional").

The defendants' contention that severance is warranted based on their vague averment that they "may wish to testify in their own defense," Def. Br. at 16, falls far short of their burden to make a "*convincing* showing" that they have "both important testimony to give concerning one count and strong need to refrain from testifying on the other.'"  *Richardson*, 515 F.3d at 81 (quoting *United States v. Alosa*, 14 F.3d 693, 695 (1st Cir. 1994)) (emphasis added, internal quotation marks omitted).  "Carrying the first part of this burden typically requires that the defendant furnish the trial court with a particularized offer of proof limning the testimony that he proposes to give and indicating how it would further his defense." *Fenton*, 367 F.3d at 22.  Here, the defendants offer nothing more than their "bald assertion of innocence," *id*.—that they acted in good faith and were uninvolved in either the bribery or false billing.  "This sort of empty rhetoric is insufficient to mandate severance on the basis of a perceived need to testify." *Id.*  And the defendants do not even attempt to explain their "strong need" to testify only selectively.  *See id*. ("while the courts zealously guard a defendant's Fifth Amendment right not to testify at all, the case law is less protective of a defendant's right to testify selectively, addressing some issues

while withholding testimony on others that are related"); *see also United States v. Torres-Crespo*, 40 F.Supp.3d 233, 237 (D.P.R. 2014) (rejecting severance where defendant contended that he "'may'" want to "present testimony" in his own defense, but provided "no details as to why he will have to forego his right to testify if the counts are not severed").[5]

III.    The Motion To Dismiss Count Five Is Frivolous

The defendants seek dismissal of Count Five—which alleges substantive wire fraud and honest services wire fraud in connection with concert tickets Garske purchased for Zentmyer at Sedlak's request—for "failure to state an offense against Garske and Sedlak," because, they contend, the indictment fails to allege that Garske acted knowingly and intentionally.  Def. Br. at 18-19.  Instead, they argue, it alleges "[a]t most . . . Mr. Garske, at Mr. Sedlak's request, *unwittingly* furthered a wire fraud scheme."  *Id*. at 19.[6]  The defendants are wrong, as the plain language of the indictment makes clear.

----

[5] The cases defendants cite are inapposite.  *See* Def. Br. at 17.  In three of the four—*United States v. Jordan*, 112 F.3d 14 (1st Cir. 1997); *United States v. Stile*, 11-CR-00185-JAW, 2014 WL 3548981 (D. Me. July 17, 2014); and *United States v. Kinsella*, 530 F. Supp. 2d 356, 364-67 (D. Me. 2008)—the courts made fact-specific findings based on the defendants' detailed proffers of their proposed testimony and why they could not testify as to the other joined charges.  Moreover, the court called *Jordan* an "unusual situation," *Jordan*, 112 F.3d at 18; found, in *Kinsella*, that "[j]udicial economy weigh[ed] heavily in favor of granting severance," 530 F. Supp. 2d at 366; and noted, in *Stile*, that "much of the evidence" concerning one set of charges was not relevant to the other, *Stile*, 2014 WL 3548981, at *6-7.  Finally, in *United States v. Ortiz*, 11-CR-230, 2012 WL 2919680 (D. Me. July 17, 2012), where the defendant appears not to have provided a proffer, the defendant was charged with false statements in purchasing a firearm and lying to a grand jury about the circumstances of that purchase.  As the court explained in granting severance, the nature of the perjury charge was such that only the defendant could give "direct evidence of what he understood" when answering the prosecutor's questions, but doing so would require him to make admissions concerning the gun purchase.  *Id*. at *1.  And the court reasoned that the gun case could be tried with three or fewer witnesses, minimizing the burden on judicial economy.  *Id*. at *2.  None of those considerations is true here.

[6] The defendants offer no explanation for why, even if their contentions were true—which they are *not*—that would in any way undermine the charge against Sedlak who, even by their own reading of the indictment, directed Garske to "further[] a wire fraud scheme."  Def. Br. at 19.

As an initial matter, "[a]n indictment is legally sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Laureano-Perez*, 797 F.3d 45, 60 (1st Cir. 2015) (internal quotations and citations omitted); *see also* Fed. R. Crim. P. 7(c).  An indictment that includes the "words of the statute itself is 'generally sufficient'" if those "words set forth all the elements of the offense without any uncertainty or ambiguity."  *United States v. Brown*, 295 F.3d 152, 154 (1st Cir. 2002).  "When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true, mindful that 'the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)); *see also id.* ("The government 'need not put forth specific evidence to survive a motion to dismiss.'") (quoting *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014)).

Count Five tracks the relevant statutory language and sets forth the requisite elements of the charged crime.  It alleges that Garske and Sedlak, "having devised *and intending to devise* . . . . a scheme and artifice to defraud" ISS of confidential client voting information, and of the honest services of Bennett, "through bribes and kickbacks, specifically tickets to concerts and sporting events, did transmit and cause to be transmitted" a wire communication in interstate commerce "*for the purpose* of executing the scheme to defraud."  Dkt. 34, ¶ 70.  It further alleges that the specific wire was an email from Garske, on or about March 18, 2011, to the "facilitator of a live music concert in California requesting" to "change the pickup name" for the concert tickets he had purchased to that of Bennett and Bennett's spouse.  *Id.*   These allegations, without

more, are sufficient to plead wire fraud and honest services wire fraud pursuant to Rule 7(c).

*See, e.g., United States v. Cranney*, 2016 WL 124529 (D. Mass. Mar. 29, 2016) (wire fraud count

that tracked language of statute and provided date/contents of the wire was sufficient under Rule

7(c)).[7]

 Moreover, Count Five specifically "re-alleges and incorporates by reference" paragraphs

1 through 60 of the indictment, Dkt. 34, ¶ 69, which contain additional allegations regarding the

concert tickets at issue in Count Five—including that Garske "caused the tickets to be falsely

recorded on his expense report as a gift to a client," *id*. ¶ 52.  Tellingly, the defendants fail to

mention this allegation, which, once proven at trial, will provide evidence of Garske's

knowledge, intent and consciousness of guilt.  The incorporated paragraphs also contain

additional specific allegations concerning Garske's knowing and intentional participation in the

bribery, including:  that he, Sedlak and the other defendants, "agreed . . . to defraud ISS" of

Bennett's honest services "through bribes and kickbacks, specifically tickets to concerts and

sporting events," *id*. ¶ 14; that Garske and the other defendants "directed Sedlak to obtain

information on how various institutions had voted on particular shareholder proposals,"

including by "specifically direct[ing] him to obtain that information from Bennett, *id*. ¶ 17(a);

that when Sedlak forwarded confidential information he obtained from Bennett to Garske and the

---

[7] Although the defendants frame their argument as a motion to dismiss based on the pleadings, the thrust of the motion seems to be that the evidence does not support the government's allegations.  *See, e.g.,* Def. Br. at 18 ("to satisfy the 'in furtherance' requirement of the second element, the government *must prove beyond a reasonable doubt* that the defendant sent (or caused to be sent) an interstate wire communication *with the purpose* of furthering his scheme.") (first emphasis added).  Of course, Count Five alleges just that.  *See* Dkt. 34, ¶ 70 (alleging that Garske and Sedlak "did transmit and cause to be transmitted" a wire communication in interstate commerce "for the purpose of executing the scheme to defraud").  To the extent the defendants challenge the sufficiency of the evidence, such an argument is premature at this stage of the proceedings.

others, he kept them informed that it came "from his 'guy'" at ISS, *id*. ¶¶ 17(e)-(f); that Sedlak, in fact, gave Bennett tickets to concerts and sporting events in exchange for the confidential information Bennett provided, *id*. ¶ 17(g); and that Garske and Ackerly agreed to bill a portion of the cost of those bribes to clients and instructed Georgeson's billing department to "falsely describe those charges in client invoices as 'courier services' or other legitimate-sounding expenses," *id*. ¶ 17(h).  Like his falsified expense report, Garske's falsification of invoices to defray the cost of the bribes to Bennett will provide evidence of his knowledge and intent to engage in the bribery scheme.  In short, the indictment more than adequately alleges that Garske knowingly and intentionally participated with Sedlak in the substantive fraud charged in Count Five, and the motion to dismiss that count should, accordingly, be denied.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the defendants' motions be denied.

Respectfully submitted,

WILLIAM D. WEINREB
ACTING UNITED STATES ATTORNEY


By:     */s/ Eric S. Rosen*_____
STEPHEN E. FRANK
ERIC S. ROSEN
Assistant U.S. Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: August 21, 2017

*/s/ Eric S. Rosen*
Eric S. Rosen
